MERIDIAN BRECKWOLDT SAMOA, Ltd., Plaintiff

v.

MAX HALECK, Inc., Defendant

High Court of American Samoa
Trial Division

CA No. 117-86

March 16, 1988

Before REES, Chief Justice, AFUOLA, Associate Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiff, Charles Ala'ilima
 For Defendant, William Reardon

FINDINGS OF FACT:

1) In 1984 defendant agreed to purchase a quantity of rice from plaintiff for $7840.40. Defendant received the goods in June 1984 and has made two payments totalling $1890.67 (check # 10329 and $640.67 from check #10289) toward the principal amount.

2) Later in 1984 defendant agreed to purchase more rice from plaintiff. The rice was received in or around December of 1984. The original agreement was for a price of $15,780.60, but after an initial payment of $5913.67 both parties treated the remaining debt as being in the amount of $9893.38. ($5913.67 and $9893.38 add up to $15807.05, or $26.45 more than the agreed purchase price. The $26.45 was apparently a charge by the bank which was supposed to have processed the transaction.) Defendant has made payments on this debt in a total amount of $9893.38 (checks # 8785, 8901, 8978 and 9407, and cashier's check # 1-6469495).

3) Defendant agreed to purchase a quantity of sugar from plaintiff, which was received in

96

September of 1984. The purchase price of $6692 was paid. (Check # 8603.)

4) Defendant agreed to purchase some plywood and some axes from plaintiff. These were received in 1984 and the purchase price, along with interest at the rate of 11% billed by plaintiff to defendant, was paid during 1985. Since payment was not made through the banking system as was originally contemplated by the parties, plaintiff was charged at least $25 by the banks. (In connection with this transaction and others, plaintiff also incurred costs for the purchase of bank drafts for onward transmission of the funds received from defendant. Although plaintiff has grouped these charges together in its exhibits with bank charges for processing of papers, the former bear a more attenuated relationship to the contracts between plaintiff and defendant.)

5) Defendant agreed to purchase from plaintiff a quantity of "safety glass" for use on bus windshields. The agreed price was 26,826 DM (Deutschemarks). We find the following facts concerning this contract:

a) Plaintiff may or may not have understood that the glass was to be used only for windshields and not for other car windows. (Plaintiff's manager/salesman, Frank Werner, used the term "window screening" in a number of his communications with suppliers and others.)

b) The president of defendant company, Max Haleck Jr., told Werner that his father had used to import glass from Germany for use on cars in American Samoa and that he wished to resume the practice.

c) After the order was placed Haleck asked Werner whether the glass could be cut. Werner inquired of his suppliers and transmitted to Haleck the reply that cutting the glass was not recommended. Haleck did not cancel the order.

d) Shortly after the glass arrived in January of 1985 Haleck asked Werner whether he was sure it was safety glass, or something to that effect. (This was in a telephone conversation that may or may not have been

especially for the purpose of asking·about the glass. The two men talked frequently by phone in connection with a variety of transactions.) Werner responded that it was indeed safety glass and that it is the standard glass used on cars in Germany. Haleck then offered the glass for sale in American Samoa.

e) The glass proved unmarketable in American Samoa, primarily because it shatters more easily than the glass that is usually used for windshields in the United States. (Plaintiff and defendant disagreed about whether the German glass is more or less dangerous than the glass usually used for American windshields. Werner testified that the particular way in which the glass shatters is itself a safety feature and that in Germany the American glass is regarded as unsafe because it cracks without disintegrating and thereby encourages people to drive with broken windshields. The Court has insufficient evidence on which to base a conclusion on this point.) Haleck received a number of complaints from people who had purchased the glass from him.

f) Haleck later asked Werner to provide certification that the glass met United States government standards for use in car windshields. In March 1986 Werner provided letters from his suppliers certifying that the glass was "fully tempered" and met "the new interim federal specification DD-G-001403." One of the letters was certified (presumably the certification was of its authenticity rather than of the accuracy of its contents) by the Hamburg Chamber of Commerce.

g) In October 1986 Haleck wrote a letter to an American Samoa Government official in charge of highway safety, requesting an inspection of the glass and imparting his suspicion that it did not meet United States standards. Mr. Haleck testified that a representative did inspect the glass and informed him it could not legally be used for windshields in American Samoa.

h) Simultaneously with the series of transactions described above, plaintiff and its parent company in Germany were attempting

98

to recover the price of the glass from the shipping line that had released the glass to defendant without receiving full payment as required by the shipping contract. The shipping company eventually paid plaintiff's parent company 18,000 DM in settlement of the claim. The shipping company's local agent then retrieved the glass from defendant.

j) Defendant never made any payments on the price of the glass.

6) Defendant agreed to purchase from plaintiff a quantity of tires which defendant received in April 1985. The purchase price was $15,576.70. There was also a bank charge of $32.63. A document received by defendant prior to the arrival of the tires indicated that interest at the rate of 9.625% would be charged "from the date of first presentation." The defendant has paid at least $14,359.33 on this purchase (cashiers check # 1-6543731, checks # 9515, 9583, 9654, 9714, 9774, 9837, 9910, 9988, 10058, and 10153, and $609.33 from check # 10289) and seems to have paid the remaining $1250 (check # 10197, of which the Court has been presented with a record but not the cancelled check itself).

7) Defendant also seems to have made a $2500 payment toward "interest on open account purchases." (Check # 10397; the court has a record but no cancelled check.)

CONCLUSIONS OF LAW:

1) Defendant owes plaintiff $5949.73 toward the principal amount of the June 1984 rice purchase.

2) The glass purchase was a binding contract notwithstanding the various misunderstandings among the parties. It is immaterial that Werner may not have understood that the glass was to be used only on windshields, since it is his unrebutted testimony that this type of glass is in fact used for windshields in Germany. We reach no conclusion about whether this glass does in fact meet U.S. safety standards; in an international transaction between two corporations represented by sophisticated businessmen it is inappropriate for a court to place on the supplier the burden of

99

determining whether the product complies with all regulations in the purchaser's locality. Defendant knew or should have known that it was ordering a product that is regarded in West Germany as "safety glass" suitable for windshields, and this is what it got. Even if defendant had immediately returned the goods on the ground that they did not conform to the contract, we would hold that the nonacceptance was a breach of the contract. That defendant actually sold some of the glass to retail customers before finally notifying plaintiff that it would not pay (even though defendant may have done this partly in reliance on Werner's reassurance that the glass was used on windshields in West Germany) and did not seek an inspection by local officials until almost two years later when the glass had proven itself thoroughly unmarketable, further militates against defendant's contention that the contract was for a different product altogether than the one delivered.

Plaintiff cannot, however, recover the entire purchase price, since it has been reimbursed by the shipping line for most of its loss. The shipping line is subrogated to the rights of plaintiff against defendant to the full extent (18,000 DM) that it reimbursed plaintiff, and may have a cause of action against the defendant. Indeed, the shipping line's agent has repossessed the glass in an apparent effort to mitigate its damages.

The parties also disagree about who should bear the burden of the shift in the exchange rate between United States dollars and Deutschemarks since the date of the contract. This burden should fall on defendant for at least two reasons. First, in an international transaction calling for payment in Deutschemarks the payment should presumably be in that currency no matter when it is made. Moreover, if defendant had complied with the agreement by making full payment at or around the time of delivery, the problem would never have materialized. Accordingly, defendant owes plaintiff for the current dollar value of 8,826 DM.

3) The Court will assume that check # 10197 for $1250 on the second rice contract and check #10397 for $2500 toward interest were actually sent to the plaintiff and were honored by the bank unless plaintiff presents contrary evidence prior to the entry of judgment herein.

4) It was a term of all the agreements that payment was to be made to the Bank of Hawaii at or around the time of delivery. In each case, sometimes with the acquiescence of the plaintiff, defendant acquired the goods without paying the bank. Since defendant was aware at the time of contracting that the papers would be processed through the bank, however, and since the evidence establishes a course of dealing between plaintiff and defendant wherein defendant has paid bank processing charges, the Court concludes that defendant owes plaintiff for any such charges incurred by plaintiff.

5) In contrast, the Court has insufficient evidence to conclude that the parties agreed that defendant would be responsible for the cost of bank drafts purchased by plaintiff for the transmission of funds to plaintiff's banks, suppliers, and principals overseas. Although these charges would probably not have been incurred if the defendant had honored the original agreements by paying the Bank of Hawaii, in all but one instance the plaintiff seems to have acquiesced in the alternate mode of delivery and payment. The Court therefore concludes that the defendant does not owe the plaintiff for the cost of bank drafts.

6) The evidence establishes that defendant knew the banks would charge interest if payment was late. If defendant had paid for the goods in the manner originally contemplated, the interest would have been collected from defendant by the Bank of Hawaii. Since defendant did not pay the bank, plaintiff was charged interest by the corresponding bank in Germany, as defendant knew or should have known would happen. Several of the contracts specified that interest would not be charged if payment was made within a certain number of days. In the case of the contract involving the tires it is clear that defendant knew the amount would be 9.25%; there is also evidence that defendant paid 11% interest on the purchase price of the plywood and axes. Nevertheless, under the statutory law of American Samoa no debtor can be charged interest in excess of 6% unless the amount "is in writing and is signed by the party to be charged." A.S.C.A. § 28.1501(a). Accordingly, defendant owes plaintiff interest at the rate of 6% on the amount that is now overdue, and 6% on amounts that have been paid for the time during which they were overdue.

101

<u>ORDER</u>

Plaintiff shall have judgment against the defendant in an amount equal to the sum of the following: $5949.73; the current dollar value of 8826 DM; any costs incurred by the plaintiff and not yet paid by defendant for bank processing charges originally contemplated for collection from defendant; 6% interest on all amounts that are or were overdue, minus $2500 already paid toward interest; court costs; and post-judgment interest at 6%. Counsel for plaintiff shall prepare a proposed judgment for the Court's signature, along with a schedule showing how the amount of the judgment was calculated.

It is so ordered.